UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Leroy Leftwich, trustee of the statutory
class of next of kin to Cameron Leftwich,
decedent,

        Plaintiff,

v.

County of Dakota, Caleb Kocher, Kent
Themmes, Cody Swanson, City of Eagan,
Jennifer Wegner, Brian Rundquist, and
Brian Rezny,

        Defendants.

Case No. 18-cv-1144 (JNE/BRT)
ORDER

Cameron Leftwich died by suicide in the Dakota County Jail. Leroy Leftwich, Cameron's father and the trustee for Cameron's next-of-kin, filed this action against Dakota County ("the County"), two County deputies, a County social worker, the City of Eagan ("the City"), and three City police officers. Plaintiff's claims arise under 42 U.S.C. § 1983 for failure to provide adequate medical care and failure to train, and under Minn. Stat. § 573.02 for wrongful death. Defendants now move for summary judgment on all claims and Plaintiff moves for partial summary judgment. For the reasons stated below, the Court grants Defendants' motions for summary judgment.

BACKGROUND

On October 29, 2016, Cameron Leftwich (hereafter referred to as "Cameron" to distinguish him from Leroy Leftwich) died after hanging himself in the Dakota County Jail ("the Jail"). ECF No. 1, Compl. ¶¶ 1, 129. Two days earlier, on October 27, Officer

1

Brian Rundquist of the Eagan Police Department arrested Cameron on assault charges. Ray Aff., Ex. 59. Officer Rundquist transported Cameron to the Jail while Officer Brian Rezny of the Eagan Police Department interviewed the victim of the assault and a witness. Ray Aff., Ex. 42 at 4. The victim, Jennifer Halsey, was Cameron's girlfriend and the witness, Charlene Pinckney, was Cameron's mother. *Id.*

Officer Rundquist interacted with Cameron for approximately fifty minutes, between taking Cameron into custody and transporting him to the Jail. Kurtz Aff., Ex. 5. While being transported, Cameron stated he "probably need[s] some anger management" and that he has "a daughter too that [he's] trying to get [his] life back in order for." *Id.* at 8:50–8:51. Cameron made no mention of suicide or self-harm.

During Jennifer's interview with Officer Rezny, she stated "Cameron just becomes really angry really fast." Ray Aff., Ex. 42 at 5. Charlene stated that "she feels Cameron has problems[,]" that "he hurts himself sometimes[,]" and that "approximately a week ago Cameron hit himself in the head with the claw of a hammer." *Id.* at 6. Charlene also stated that Cameron had "jumped out of cars a few dozen times." Ray Aff., Ex. 46 at 6. Officer Rezny "clarified and asked [Charlene] if she had any concerns about [Cameron] committing suicide or killing himself, and she said no . . . ." Ray Aff., Ex. 22 ("Rezny Dep.") at 29.

While Cameron was being transported, Sergeant Jennifer Wegner of the Eagan Police Department completed an Offender Tracking Form ("OTF") for him. Ray Aff., Ex. 21 ("Wegner Dep.") at 6–7. The OTF facilitates admission of a person arrested by the City into the Jail. *Id.* The OTF asks questions about the arrestee, including: (1) "Has the arrestee

demonstrated any behaviors or made any statements/remarks that suggests suicidal tendencies?" and (2) "Has this arrestee's friends or family members suggested any medical or mental issues (including suicidal tendencies)?" Ray Aff., Ex. 38 at 2. Sergeant Wegner checked "no" to both questions. *Id.* In her deposition, she stated that she did not interact with Cameron and that officers Rundquist and Rezny did not express any concerns about Cameron to her. Wegner Dep. at 4–8.

When Cameron arrived at the Jail, Officer Rundquist spoke briefly with the Jail staff and did not express any concerns about Cameron's mental health. The Jail has a one-page suicide intervention and prevention policy. Ray Aff., Ex. 73. This policy includes training deputies in suicide prevention and intervention, screening each inmate for mental and medical health concerns at intake, conducting well-being checks every twenty-five minutes, and a Jail contracted nurse conducting follow-up medical and suicide risk assessments within seventy-two hours of incarceration. *Id.* The Jail also has a policy of scheduling an inmate who displays or discloses "significant mental health issues" during the intake process for a mental health assessment the next staffed clinic day. Verby Aff., Ex. B.

Deputy Caleb Kocher from Dakota County completed Cameron's intake, which included a questionnaire on his mental health. Ray Aff., Ex. 26 ("Kocher Dep.") at 19–22. Deputy Kocher asked Cameron "Have you attempted suicide or tried to do serious harm to yourself?" and "Do you have a plan to commit suicide or are you thinking about harming yourself now?" Kocher Aff., Ex. A. Cameron answered "no" to both questions. *Id.* Deputy Kocher also asked Cameron "Have you ever been told that you have mental illness?" *Id.*

3

Cameron disclosed that he had "dual disorder," which Deputy Kocher was unfamiliar with. *Id*; *see also* Kocher Dep. at 17–18. Cameron stated that he was not taking any medication or being treated for the condition. Kocher Aff., Ex. A; *see also* Kocher Dep. at 17–18. By disclosing that he had a mental illness, Cameron scored a one on his mental health questionnaire. Based on his interactions with Cameron, Deputy Kocher stated he "did not have any feeling that [Cameron] was going to hurt himself." Kocher Dep. at 17. Deputy Kocher did not facilitate a suicide watch for Cameron. Kocher Aff. at 1–2. Deputy Kocher did facilitate a watch that night for a different inmate who answered "no" to the above questions, based on his observations of that inmate's behavior. *Id.*

Deputy Kent Themmes from Dakota County subsequently completed Cameron's booking. Themmes Aff. at 1. Deputy Themmes stated that nothing about Cameron's "behavior or demeanor gave [him] cause for concern that [Cameron] was at risk of committing suicide at the Jail." *Id.*

Both deputies stated they would have placed Cameron on a suicide watch if his OTF had indicated he or his family members suggested that he was at a risk of suicide. *See* Kocher Dep. at 16–17; Ray Aff., Ex. 27 ("Themmes Dep.") at 33–35.

On October 28, the day after Cameron was booked into the Jail, a Jail nurse reviewed his questionnaire and noted that he was due for an in-person assessment by October 30. Ray Aff., Ex. 24 at 114. Cody Swanson, a Dakota County contracted social worker, did not see Cameron when Swanson was at the Jail on October 28. Ray Aff., Ex. 28 ("Swanson Dep") at 22. Swanson stated he was trained to see an inmate within twenty-

4

four hours if the inmate scored a one or higher on the intake questionnaire but was not always able to do so in the two hours he spent at the Jail every weekday. *Id.* at 11–12.

Cameron was moved into the Jail's housing unit at 9:51 p.m. on October 28. Verby Aff. ¶ 6. Shortly after, Cameron asked Deputy Bryan Olson from Dakota County how to arrange for someone to visit him the next day and Deputy Olson informed Cameron about a visitor sign-up sheet. Olson Aff. ¶ 6. Deputy Olson observed Cameron lying on his bed during a well-being check at approximately 11:35 p.m. Verby Aff., Ex. C. During the next well-being check at 11:56 p.m., Deputy Olson discovered Cameron hanging from the top bunk of his cell bed. *Id.* Deputy Olson immediately asked for medical assistance and Jail staff entered Cameron's cell less than one minute after he was discovered. Olson Aff. ¶ 5. Cameron was pronounced dead at approximately 12:28 a.m. on October 29. Verby Aff., Ex. C.

In April 2018, Leroy Leftwich brought this action against Dakota County, County Deputies Kocher and Themmes, County social worker Swanson, the City of Eagan, City police officers Rundquist and Rezny, and City police sergeant Wegner. Compl. at 1. Plaintiff sues all defendants for failure to provide adequate medical care under § 1983; the County and the City for failure to train under § 1983: and Defendants Wegner, Swanson, the City, and the County for wrongful death under Minn. Stat. § 573.02. *Id.* at 25–26. Defendants now move for summary judgment on all claims. Plaintiff moves for summary judgment against the City and the City police officers on his § 1983 claims and several of Defendants' affirmative defenses.

5

STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). In determining whether summary judgment is appropriate, a court views the record and all justifiable inferences in favor of the nonmoving party. *Liberty Lobby*, 477 U.S. at 255.

DISCUSSION

I.   Section 1983 Claims

Plaintiff asserts two claims under § 1983: (1) failure to provide adequate medical care against all defendants, and (2) failure to train against the City and the County. The parties dispute whether Plaintiff has properly brought his claims against the individual defendants and whether either municipality can be held liable.

A. Individual Defendants

The relief Plaintiff may pursue against the individual defendants depends on whether he has asserted his § 1983 claims against them in their official capacities, individual capacities, or both. "Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive

6

relief." *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) (citing *Hafer v. Melo*, 502 U.S. 21, 30 (1991)); *see also Hopkins v. Saunders*, 199 F.3d 968, 977 (8th Cir. 1999) ("[The] Eleventh Amendment protects a state official sued in his official capacity from all claims except for certain forms of prospective equitable relief . . ."), *cert. denied,* 531 U.S. 873 (2000). If "the complaint does not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity." *Baker v. Chisom*, 501 F.3d 920, 923 (8th Cir. 2007).

Here, Plaintiff has not explicitly named Kocher, Themmes, Swanson, Wegner, Rundquist, or Rezny as defendants in their individual capacity. *See* Compl. ¶¶ 9–15. It is thus presumed that Plaintiff only sues these defendants in their official capacity.

Plaintiff's arguments to the contrary are unpersuasive. Plaintiff asserts that his identifying each defendant as "an individual" and his request for punitive damages sufficiently puts these defendants on notice that they are being sued in both their individual and official capacities.[1] This is contrary to Eighth Circuit law: "only an express statement that [the defendants] are being sued in their individual capacity will suffice to give proper notice to the defendants." *Remington v. Hoopes*, 611 F. App'x 883, 885 (8th Cir. 2015). The Eighth Circuit has emphasized that it has a strict requirement of express pleading for individual capacity claims, in contrast to the "more lenient" and flexible § 1983 pleading rules that prevail in other circuits. *See Baker*, 501 F.3d at 924 n.2 (explaining that the

---

[1] For example, Plaintiff states "Cody Swanson *is an individual* who, at all times relevant to this action, was a social worker in the Dakota County Social Services Department, and upon information and belief, resides in South Saint Paul, Minnesota." Compl. ¶ 11 (emphasis added). Plaintiff lists each individual defendant in a similar manner.

7

"flexible approach" to pleading individual capacity claims is foreclosed by circuit precedent and therefore may only be adopted by the court sitting en banc).

Because Plaintiff only pursues official capacity § 1983 claims against the individual defendants, he may only seek injunctive relief—which he does not. Plaintiff's complaint lacks any mention of injunctive relief. His complaint solely pursues money damages in the form of compensatory and punitive relief along with reasonable attorneys' fees. *See* Compl. at 28. The Court therefore grants summary judgment in favor of the individual defendants because Plaintiff fails to pursue any relief which the Court may grant.

### B.  Municipal Defendants

Under *Monell*, § "1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Indep.*, 829 F.3d 695, 699 (8th Cir. 2016) (internal citations and quotations omitted). In any case, absent a constitutional violation by a City or County employee, there can be no § 1983 or *Monell* liability. *See Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018). Thus, the Court first examines whether a reasonable jury could find that any City or County employee committed a constitutional violation. The Court will only delve into *Monell* liability if the answer to that question is affirmative.

#### 1.  Failure to Provide Adequate Medical Care

In a jail suicide case, municipal officials violate the Eighth Amendment for failure to provide adequate medical care if they knew that an inmate presents a substantial suicide risk and failed to respond reasonably. *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir.

8

2003). The officials must have actual knowledge of facts evidencing a substantial suicide risk and infer that the inmate presents such a risk. *Id.* It is insufficient for a plaintiff to show that the official should have known of a significant risk. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). Rather, the plaintiff must show that the officials "acted in deliberate indifference" to the risk. *Luckert v. Dodge Cty.*, 684 F.3d 808, 817 (8th Cir. 2012). If the risk is obvious, a plaintiff may use circumstantial evidence to infer actual knowledge. *Coleman*, 349 F.3d at 538. A court must focus on "the particular risk of suicide posed by the specific prisoner, rather than on the generalized threat of suicide among the population of prisoners as a whole." *Hott v. Hennepin Cty.*, 260 F.3d 901, 905 (8th Cir. 2001)

Plaintiff points to two facts to assert that the City knew and appreciated Cameron's substantial suicide risk. First, Cameron admitted that he struggled with his anger to Officer Rundquist. Second, Charlene told Officer Rezny that Cameron had taken a hammer to his head and jumped out of moving cars. Plaintiff asserts Officer Rezny and Sergeant Wegner failed to report this information to the County through Cameron's OTF or in person when Cameron entered the Jail. Plaintiff claims Deputies Kocher and Themmes would have placed Cameron on a suicide watch if they had received this information. *See* Kocher Dep. at 16–17; Themmes Dep. at 33–35.

Plaintiff points to multiple facts to argue that the County must have known of Cameron's substantial suicide risk. First, Cameron disclosed that he had dual disorder. Second, he disclosed that he was not taking any medication or being treated for the condition. Third, he had been charged with assault earlier that evening. And fourth, Cameron would be detained in the Jail until a bail hearing.

9

The County and City do not dispute these facts but argue that they are insufficient to find that the employees of either entity knew or must have known that Cameron had a substantial suicide risk.

Viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that the City's police officers had actual knowledge or acted with deliberate indifference to a substantial suicide risk. While Cameron mentioned anger and mental health issues to Officer Rundquist, he also spoke of the future and about turning his life around for his young daughter. Indeed, Cameron never mentioned self-harm or suicide to Officer Rundquist. Officer Rezny determined that Charlene's statements were consistent with anger management issues. In fact, during his interview with Charlene, Officer Rezny "clarified and asked her if she had any concerns about [Cameron] committing suicide or killing himself . . . ." Rezny Dep. at 29. Charlene responded "no." *Id.* The facts do not show that either officer knew, or must have known, that Cameron had a substantial suicide risk and explain why neither expressed any concerns to Sergeant Wegner, who filled out the OTF.

Similarly, no reasonable jury could find that the County officials knew or must have known that Cameron had a substantial suicide risk. Being arrested for assault and being detained until a bail hearing are commonplace in many county jails and do not give rise to an inference of a substantial suicide risk. *See Hott*, 260 F.3d at 905. Nor does dual disorder give rise to such an inference; dual disorder meant that Cameron had both mental health and chemical dependency diagnoses. *See* Ray Aff., Ex. 76; Swanson Dep. at 3–4. Finally, Cameron answered "no" to Deputy Kocher's questions assessing whether he was at a risk

10

of suicide. Indeed, Deputy Kocher stated that Cameron behaved normally during the intake process and that he had facilitated a suicide watch for a different inmate who had answered "no" because of that inmate's behavior.

In conclusion, the City and County cannot be held liable under § 1983 for failure to provide adequate medical care because no reasonable jury could find that the County or City officials knew or must have known that Cameron had a substantial suicide risk.

### 2. Failure to Train

A municipality is only liable for failure to train under § 1983 "where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Because there is no underlying constitutional violation, the City and County cannot be held liable for failure to train. *Whitney*, 887 F.3d at 861.

## II. Wrongful Death Claim

Plaintiff sues Defendants Wegner, Swanson, the City, and the County for wrongful death under Minn. Stat. § 573.02. Defendants Wegner and Swanson argue that they are entitled to common law immunity for public officials. The City asserts it is entitled to vicarious public official immunity for Sergeant Wegner's conduct and the County claims it is entitled to common law immunity for public entities. Alternatively, all Defendants argue that even if the immunities do not apply, they had no duty to protect Cameron from the risk of suicide while he was in their custody.

### A. Public Official Immunity

Public officials who carry out required duties that call for the exercise of their discretion are not personally liable for tort claims unless they act willfully or maliciously.

11

*Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). Courts conduct a three-step inquiry to determine whether an official is entitled to such immunity.

At the first step, courts identify "the conduct at issue." *Kariniemi v. City of Rockford*, 882 N.W.2d 593, 600 (Minn. 2016). At the second step, courts determine whether that conduct is discretionary or ministerial in nature. *Id.* A public official's conduct is discretionary if it "requires the exercise of individual judgment in carrying out the official's duties." *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998). In contrast, the conduct is ministerial when a duty is "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Johnson v. State*, 553 N.W.2d 40, 46 (Minn. 1996); *see, e.g.*, *DeLuna v. Mower Cty.*, 936 F.3d 711, 719 (8th Cir. 2019) (holding that a Minnesota statute requiring jail officials to provide "suitable shoes" established a ministerial duty); *see also Mumm v. Mornson*, 708 N.W.2d 475, 492 (Minn. 2006) (holding that a policy commanding that police "shall discontinue" a pursuit created a ministerial duty). At the third step of the analysis, a public official who engaged in discretionary conduct will be entitled to official immunity unless her or his conduct was willful or malicious. *Kariniemi*, 882 N.W.2d at 600. A public official who engaged in ministerial conduct, on the other hand, will be entitled to official immunity unless the conduct "was either not performed or was performed negligently." *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 660 (Minn. 2004).

Swanson and Sergeant Wegner claim public official immunity.

1. Defendant Wegner

The conduct at issue is Sergeant Wegner checking "no" on Cameron's OTF to the

12

questions: (1) "Has the arrestee demonstrated any behaviors or made any statements/remarks that suggests suicidal tendencies?" and (2) "Has this arrestee's friends or family members suggested any medical or mental issues (including suicidal tendencies)?" Ray Aff., Ex. 38 at 2.

Next, the Court must determine whether Sergeant Wegner's conduct was discretionary or ministerial. The City's police officers have a ministerial duty to fill out an OTF for every arrestee before the arrestee arrives at a jail. *See, e.g.*, Wegner Dep. at 6 ("I *have* to fill out the Offender Tracking Form." (emphasis added)); Ray Aff., Ex. 12, Def.'s Ans. to Pl.'s Interrog. No. 5 ("[L]ocal law enforcement agencies transmit either an 'Arrest Jail' form [] or an Offender Tracking Form [] to the Jail upon transferring custody of an inmate to Jail Staff . . . the City of Eagan Police Department . . . transmit[s] Offender Tracking Forms to the Jail . . . .").

However, this ministerial duty is limited to providing information related to the purpose of the OTF. The OTF states its purpose is to:

> 1) Supply the prosecuting authority with the necessary data when applying for an Adult or Juvenile Felony, Gross, or Targeted Misdemeanor . . .; 2) Supply the BCA with disposition information if a formal complaint is NOT issued; 3) Allow the prosecutor to report diversion data; [and] 4) Supply the court with charging information.

Ray Aff., Ex. 59. This is consistent with Sergeant Wegner's testimony that the purpose of the OTF is to provide basic information about an arrestee, including: "the crimes that the individual is being booked on, their full name, date of birth, the arresting officer, the time, [and] the location." Wegner Dep. at 19.

Sergeant Wegner fulfilled her ministerial duty by sending Cameron's OTF to the Jail with the necessary information for the prosecuting authority, including his biographical and arresting charge information. Any additional mental health information Sergeant Wegner provided on the OTF was discretionary conduct. Contrary to Plaintiff's assertion, there is no City policy or Minnesota statute establishing that Sergeant Wegner had an "absolute, certain, and imperative" duty to conduct a mental health assessment for Cameron before answering the mental health questions on the OTF and transmitting it to the Jail. *Johnson*, 553 N.W.2d at 46.

At the final step, the Court must determine whether Sergeant Wegner acted willfully or maliciously. Sergeant Wegner did not interact with Cameron and therefore relied on Officer Rundquist, who did interact with Cameron, and Officer Rezny, who interviewed Cameron's mother and girlfriend. Neither officer expressed any concerns about Cameron.[2] Sergeant Wegner thus decided to answer "no" to the mental health questions on Cameron's OTF. There is no evidence that Sergeant Wegner's conduct in answering "no" was willful or malicious.

---

[2] As discussed, neither officer suspected that Cameron may commit suicide. In fact, Cameron spoke positively of the future to Officer Rundquist and Cameron's mother told Officer Rezny that she did not think Cameron was suicidal. Both officers determined that Cameron struggled with anger management. For instance, Officer Rezny explained:
> So the way [Charlene] and the victim continued to say anger management, anger, he hits himself in the head with a hammer because he gets angry, he jumps out of the car when he gets angry, the victim stating he looks for things to get angry [about], he looks for things to get wrong, he's angry all the time, throughout my entire course of the investigation and the clarifying questions that I asked, I was under the understanding that this was an anger issue, not a mental health issue.

Rezny Dep. at 32.

In sum, Sergeant Wegner is entitled to public official immunity because her conduct in answering the mental health questions on Cameron's OTF was discretionary and she did not act willfully or maliciously in exercising her judgment. The City also enjoys vicarious official immunity from Plaintiff's wrongful death claim because it arises out of Sergeant Wegner's conduct. *See Schroeder v. St. Louis County*, 708 N.W.2d 497, 508 (Minn. 2006) ("In general, when a public official is found to be immune from suit on a particular issue, [her] government employer will enjoy vicarious official immunity from a suit arising from the employee's conduct."); Compl. ¶ 143.

2. Defendant Swanson

The conduct at issue is Swanson's decision not to provide a mental health screening to Cameron within twenty-four hours of his incarceration.

Plaintiff argues Swanson had a ministerial duty to see an inmate who scored a one or higher on the Jail intake questionnaire within twenty-four hours of incarceration. Plaintiff relies on Swanson's deposition testimony, during which Swanson stated that he was "trained" to perform his job this way. But the way Swanson was "trained" to do his job does not create an "absolute, certain, and imperative" duty. *Johnson*, 553 N.W.2d at 46. Plaintiff does not cite to any Minnesota statute or Jail policy creating a mandatory duty for Swanson to see an inmate scoring a one or higher within twenty-four hours of incarceration.[3] Swanson's conduct was thus discretionary.

---

[3] The Court notes that the Jail had a written suicide prevention policy requiring the Jail's "contracted medical nurses [to] conduct follow-up medical and suicide risk assessments within 72 hours of incarceration." Ray Aff., Ex. 73. This policy does not apply to Swanson because he is a social worker, not a jail contracted nurse. In any case, Cameron

15

At the final step, the Court must determine whether Swanson acted willfully or maliciously. Plaintiff provides no argument in favor of, and the Court finds no support in the record for, such a finding. Indeed, Swanson explained in his deposition that he was being job shadowed and there "wasn't an opportunity to see Mr. Leftwich in the two hours that [he] was allotted to be there." Swanson Dep. at 23.

In short, Swanson is entitled to public official immunity because his conduct in deciding not to give Cameron a mental health screening within twenty-four hours of incarceration was discretionary, and Swanson did not act willfully or maliciously in exercising his judgment. The County also enjoys vicarious official immunity from Plaintiff's wrongful death claim to the extent it arises out of Swanson's conduct. *See Schroeder*, 708 N.W.2d at 508.

B. Public Entity Immunity

A municipality is generally subject to tort claims unless it can show that the challenged conduct arose from discretionary functions or duties. Minn. Stat. § 466.03, subdiv. 6; *Conlin v. City of St. Paul*, 605 N.W.2d 396, 402 (Minn. 2000). The Minnesota Supreme Court has found that planning-level government decisions are discretionary and

---

was scheduled to have a medical and suicide risk assessment by October 30, within seventy-two hours of his incarceration.

    The Court also notes that the County had a custom or policy of assessing inmates who display or disclose "significant mental health issues" during the intake process the next staffed clinic day. This policy does not apply to Cameron because the record does not support an inference that a disclosure of dual disorder by itself constitutes a "significant mental health issue," and neither Deputies Themmes nor Kocher thought Cameron had "significant mental health issues" when interacting with him during the intake and booking process.

16

entitled to statutory immunity, but operational decisions are not. *Id.* Planning-level decisions involve public policy and balancing social, political, or economic considerations. *Id.*; *see also Johnson*, 553 N.W.2d at 47 (explaining that "decisions regarding the placement of inmates and patients, and decisions regarding how much liberty to afford them, are protected policy decisions immune from suit" (emphasis omitted)). Operational decisions involve "ordinary day-to-day" government actions. *Conlin*, 605 N.W.2d at 400.

Plaintiff claims the alleged negligence arises from the County's failure to implement its policy of a Jail-contracted nurse assessing an inmate's medical and mental health within twenty-four hours of incarceration. The record reveals no policy to this effect. The Jail has a written policy requiring inmates to have a medical and mental health assessment within seventy-two hours of incarceration. The Jail also has a policy of scheduling an inmate who displays or discloses "significant mental health issues" for a mental health assessment the next staffed clinic day. But there are no facts supporting that the next staffed clinic day is the day after the inmate's intake procedure, within twenty-four hours of incarceration.[4] Because Plaintiff relies on a policy that does not exist, the point of contention must be the making (or not) of policy rather than the implementation of policy. Plaintiff argues, in essence, that the Jail should have made a policy requiring all inmates to have a medical and mental health assessment within twenty-four hours of incarceration.

The County's policy to provide a mental health assessment within seventy-two hours—instead of twenty-four hours—to inmates who do not display significant mental

---

[4] In any event, this policy does not apply to Cameron. *Supra* note 3.

17

health issues is a planning decision protected by statutory immunity. This policy is of the sort that results from balancing patient treatment issues, employee efficiency, and economics. The Jail's weighing of these planning issues "lie[s] at the center of discretionary action." *Watson by Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 412 (Minn. 1996). Courts do not second-guess such policymaking. *Id.*

Because the City, County, and individual defendants are entitled to immunity, the Court does not reach the merits of the wrongful death claim.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. County Defendants' Motion for Summary Judgment, ECF No. 135, is GRANTED;

2. Defendants City of Eagan, Jennifer Wegner, Brian Rundquist, and Brian Rezny's Motion for Summary Judgment, ECF No. 150, is GRANTED; and

3. Plaintiff's Motion for Partial Summary Judgment, ECF No. 163, is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: April 16, 2020

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge
